**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | Docket No: 25-CR-115 (Pages 1 through 33) |
| v. | Casper, Wyoming January 14, 2026 4:57 p.m. |
| RANDALL THOMAS BAILEY, Defendant. | |

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE SCOTT W. SKAVDAHL**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff: Office of United States Attorney
By: PAIGE HAMMER
2120 Capitol Avenue
Suite 4000
Cheyenne, Wyoming 82001

For the Defendant: Krone Law, LLC
By: SAMUEL PETER KRONE
901 36th Street
Post Office Box 2481
Cody, Wyoming 82414

Court Reporter: SHANNON L. ZELT, RPR FOCR
111 South Wolcott Street
Casper, Wyoming 82601
shannon_zelt@wyd.uscourts.gov

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

(Proceedings commenced at 4:57 p.m., January 14, 2026.)

THE COURTROOM DEPUTY: Court is now in session.

THE COURT: Court is in session in the matter United States of America versus Randall Thomas Bailey, Criminal Case Number 25-CR-115.

I note the presence of Mr. Bailey and his counsel, Mr. Krone, and counsel for the United States, Ms. Hammer.

The matter is before the Court for purposes of sentencing. And before we begin that process, let me verify timely receipt and review of the presentence report with your client, Mr. Krone.

MR. KRONE: Thank you, Your Honor. We did receive the presentence investigation. I have reviewed it with Mr. Bailey. There were some modifications that were presented prior to me coming on as counsel to Mr. Bailey. I'm not sure if they were adopted in the report or not, but we could address some of those areas if the Court would be willing to do that, Your Honor, at this stage.

THE COURT: All right. Well, let me -- let me ask.

Ms. Hammer, are there any preliminary issues or matters we need to take up?

MS. HAMMER: Not from the United States. And the United States is not aware of any previous concerns that were raised about the PSR, so I guess I'm curious to see what that looks like.

THE COURT: All right.

Mr. Krone, I don't know if you're talking about variance issues or departure issues or something else in terms of the accuracy of the presentence report.

MR. KRONE: Your Honor, it -- it relates to his financial condition mostly and the financial condition -- and the child support amount that has been paid and is concurrently being paid specifically to those items.

I don't believe it has anything to do with variance or the -- the points, Your Honor.

THE COURT: All right. Well, let me -- let me verify with you, Mr. Bailey. You've had the opportunity to go over the presentence report with your attorney?

THE DEFENDANT: Which attorney, Your Honor?

THE COURT: Well, with -- with Mr. Krone.

THE DEFENDANT: We just gone over it briefly, and I told him the things that concern me from the -- the previous lapses that Mr. Custis had left.

THE COURT: All right.

THE DEFENDANT: So what I'm saying, Your Honor, is I essentially was working with his paralegal.

THE COURT: All right. Well, we're delayed today. Given the time I assumed -- were you able to talk to him before -- just before we came into the courtroom?

THE DEFENDANT: I spoke to him for a few minutes

before, yes, sir.

THE COURT: Do you need to talk to him some more?

THE DEFENDANT: I'm not comfortable telling you that it's hundred percent accurate and putting myself in that corner because the -- the reason that I had asked you to remove Mr. Custis is the few conversations we had were so vitriolic. And then, when the report came back, it had so many errors and things that I had not said that I was a little shocked. And so I pointed those out to Mr. Krone in the time that we had.

THE COURT: All right. Well, let me just for the record note that this matter was originally set for sentencing --

MS. HAMMER: The 6th.

THE COURT: -- week and a half go, June 6th -- or January 6th. I continued it because Mr. Krone was conflicted in terms of a trial setting. That trial actually ended up not going, but it was canceled at the last minute on Friday before.

So the short of it is is that I've continued it to today's date so that there would be time to allow a conferral and any further need to review. I've received various information, letters of support on behalf of Mr. Bailey, and I've reviewed those.

But in terms of any factual information, Mr. Krone,

I'll let you go ahead and identify that for the record at this time.

I'll allow you to remain seated.

MR. KRONE: Thank you, Your Honor.

Specifically, Your Honor, as it relates to the assets and financial condition on page 11, Your Honor, the actual amounts that were listed in paragraph 50 the -- it's my understanding in conferring with Mr. Bailey that those -- the amounts that are currently in his Fidelity accounts as well as his Vanguard accounts are lower than as stated.

In addition, Your Honor, as it relates to his child support obligation, which I believe is --

THE COURT: It's identified in paragraph 37.

MR. KRONE: 37, Your Honor. A couple corrections to that. Currently, Your Honor -- first of all, he had made some additional payments that he advised me of that were not -- were not included in paragraph 37.

In addition to that, Your Honor, currently his social security benefits are going to pay the child support obligation for his youngest child. The two older children, Your Honor, have aged out of the system. They're both 18 now.

So he wanted to make sure that those -- the -- that his financial condition both in paragraph -- previously discussed in paragraph 50 and his financial obligations as to child support in 37 are different now in that he has less

money than stated in the report and also that he is continuing the support for his younger child through his social security.

THE COURT: All right. And in terms of any rough amount per month for that payment, what are we looking at? I believe there was something indicated as to the social security but just -- is it the $2,338 per month that's --

THE DEFENDANT: Your Honor, she gets --

THE COURT: Let me have you tell counsel so that they -- I don't want you to make any statements.

MR. KRONE: Your Honor, the current amount that he is paying is $2,023 -- $2,223, and that has not been -- and he believes that that needs to be adjusted, but he's not had the opportunity to adjust that through the district court.

THE COURT: All right. I would note that, that amount being identified then. Other -- and I would inter delineate for purposes of the record that amount noted for child support in paragraph 37.

Regarding the Fidelity accounts, there's a 40K through Fidelity that was valued there. Is that the number that needs to be modified in paragraph 50?

MR. KRONE: Your Honor, my understanding is that those figures are -- are fairly accurate, and they were not as -- he did not deviate from those amounts as much as I had thought in our previous conversation. So we'll stay with those figures in paragraph 50, Your Honor.

THE COURT: All right. Very well. Any other factual or other issues in terms of the accuracy of the presentence report that we need to address?

MR. KRONE: Your Honor, in terms of the -- the statements from law enforcement from the Cody Police Department that kind of highlight some of the collateral information that was collected in the report, Mr. Bailey does not believe that, obviously, his version of that has been presented, but I don't believe it's factual. I don't believe the way that it's written needs to be adjusted, Your Honor.

THE COURT: All right.

MR. KRONE: So that -- that would be all.

THE COURT: All right. Very well.

Let me note then, based upon the information provided -- and I'll certainly take into consideration that information -- but it does not appear material to the calculations under the advisory sentencing guidelines.

And we're looking at a total offense level of 26, with a Criminal History Category I prior to any variance or departure which would and does result in a advisory guideline range of 63 to 78 months and, under Count Two, supervised release period of not more than three years and, Count Four, not more than three years. A probationary period, defendant would be ineligible for. A fine range of $25,000 to $250,000. And restitution is not applicable in this matter. There is a

$200 special assessment.

Mr. Krone, do you agree as to the applicable guideline calculations and provisions?

MR. KRONE: Yes, Your Honor, in reviewing the report, I agree with a those.

THE COURT: And, Ms. Hammer, does the United States agree?

MS. HAMMER: We do. Thank you.

THE COURT: I would hear from the United States as to its position regarding sentencing, and then I would hear from defense.

MS. HAMMER: Good evening, Your Honor.

THE COURT: Good evening.

MS. HAMMER: Given the time I'll be brief.

THE COURT: Take as much as you want. You had to wait.

MS. HAMMER: It's okay, Your Honor, I'd like to hit the road as soon as I can.

Your Honor, with Mr. Bailey's case I think it's important that we don't think of this case within a vacuum and look at the greater picture here. We acknowledge that Mr. Bailey is a Criminal History Category I, that these are his first two felony convictions, and that he seemingly has had a successful career and adult life.

While considering the 3553(a) sentencing factors,

specifically nature and circumstances of the offense and history and characteristics of Mr. Bailey, we are strongly advocating against the Court varying downward and, instead, imposing a sentence within the low end of the advisory sentencing guideline range. The fact that he has no countable criminal history is already taken into account with the guideline calculation given that he is a Criminal History Category I. We don't think that that should -- is deserving of any further downward variance.

Despite what some of the letters of support for Mr. Bailey indicate and, as noted by Ms. Bailey's letter to this Court, his criminal conduct is not just a mere lapse in judgment. It is not as though he had a moment of anger and all of a sudden ended up in possession of 25 firearms in his home.

I think it's important to note that, of those 25 firearms, there's some items that are of significant concern to the Government and, I think, to the community at large. There's a machine gun in his household. There were -- there was a silencer, and there were two pipe bombs which were sent off to the lab for ATF and were determined to be functional, that they could have the ability to actually implode.

Mr. Bailey, made a very conscious decision over the six months from April to October or November when these items were found. In April there were multiple settings and

hearings related to a stalking protection order application that Mr. Bailey's ex-wife had put to the court. Mr. Bailey had actual knowledge that he knew that he was not supposed to be having firearms. The recording from these hearings make it very clear that he was present with the counsel.

He was able to participate in that hearing and, at the end of it after Judge Darrah had considered the evidence that was presented to him, Judge Darrah made this statement specifically: Quote, You are not going to be allowed to use or possess firearms. It is my understanding that you have several, and you are going to have to figure out someone else to hold those for you.

That didn't happen. He ignored the Court and chose to do what he wanted, which was to keep those firearms at his home. His disregard for court orders on November -- in November of 2024 by going within 150 yards of his ex-wife's house and breaking into her car is how this case came to light in the first place.

Mr. Bailey's disregard for the law and the safety of others extends further back than just what we have in front of the court. A year after the divorce Mr. Bailey engaged in stalking behavior towards his wife that ultimately led her to seek the protection order that's alleged here and he's pled guilty to having violated by possessing these firearms.

It's unclear why, but certainly the allegations that

were in the evidence presented to the state court judge were concerning given that this is a stalking protection order. Ultimately, Your Honor, the protection order was issued against Mr. Bailey because Judge Darrah had heard enough evidence to believe that she had met her burden in showing that Mr. Bailey had engaged in continuous stalking behavior, that her -- her life and safety was at danger.

Mr. Bailey is not a victim of the system as potentially he claims given some of the statements made in the letters of support that indicate that this -- what he has experienced is an injustice. But, in fact, it's quite the opposite. It's accountability for his own conduct. It's accountability for what he did when he thought no one was watching and what he could get away with. And but for his ex-wife coming forward and putting herself back into the cross-hairs by reporting his conduct to police, it's very likely that he may well have gotten away with this.

This crime is serious, Your Honor. I know the Court knows that, but I want to emphasize that because just because his criminal history is zero, that doesn't necessarily reflect the things that have not -- that happened here. Stalking is a very serious offense. There was a protection order in place.

He continued to have firearms in his possession. One in the vehicle, and then multiple at the house. The machine gun is not something that the average citizen has. A pipe

bomb -- two pipe bombs is not something that the average citizen has. And an unregistered silencer is certainly not something that the average person has.

For all those reasons, we are requesting this Court to impose a sentence at the low end of the guideline range. I'm asking the Court to put in the order that any sentence should run concurrent to Park County Case CR-2024-221-COD.

Your Honor, the United States is also dismissing, pursuant to the plea agreement, Counts One and Three. I would move to do so.

We were -- we also have no objection to the three years of supervised release and the terms as outlined in the PSR.

And, finally, I would ask this Court to order the forfeiture of the firearms as their interest relates -- or as it relates to Mr. Bailey's interest in those items given that he has forfeited that.

Thank you.

THE COURT: All right. Thank you.

Mr. Krone, you and Mr. Bailey may come forward to the podium.

Mr. Krone.

MR. KRONE: Thank you, Your Honor.

Your Honor, as the Court's well aware the sentence in this matter pursuant to 18 U.S.C. 3553(a) should be

sufficient, but not greater than necessary to protect community service and to protect the community and to be fair to the defendant.

What we have here, Your Honor, is Mr. Bailey who has no criminal history prior to these events. We also have a --

THE COURT: He did have criminal history that wasn't countable, but it was involving game and fish violations; correct?

MR. KRONE: That's correct, Your Honor. I'm sorry. A zero on the criminal history index; but, yes, he did have the -- the one past misdemeanor offense.

What we have, Your Honor, is no use of these firearms that -- we have no evidence of any violence, no evidence of brandishing the firearms, no evidence of threat to use the firearms.

In fact, we just have the possession of the firearms. Mr. Bailey is a 66-year-old retired man. He's been financially stable. He has no history of substance abuse or violent crime. And, as I mentioned, just that previous one misdemeanor conviction that he -- he had in Big Horn County, Wyoming.

Your Honor, I -- I don't believe that based on who Mr. Bailey is and -- and his -- his long time being in the community and being a provider for the family would justify a lengthy prison sentence in this case. In fact, we would ask

that the Court would go to the -- to the low end of the range or even go below that range, Your Honor, based on -- on who he is and -- and his history.

So, Your Honor, with that we would respectfully request that it would be on the low end or vary below that low end of the recommendation.

Your Honor, in terms of the supervised release, we -- the issue with the recommendation on page 13, number 5, we're not entirely certain with the no contact with Ms. Bailey as she's not a victim in this case. So we request that that would not be put in place as well, but we do think that supervised release would be appropriate in this matter. And we believe that would be appropriate, Your Honor.

Thank you.

THE COURT: Mr. Bailey, you're entitled to speak in allocution of any sentence. If there's anything you wish to say, I'd hear from you at this time.

THE DEFENDANT: Hello, Your Honor. Thank you.

I came West and came to Wyoming following my job. I was born in South Carolina. I'm a child, one of three children of a man and a woman. Never remarried. My father passed away when I was quite young.

THE COURT: 40.

THE DEFENDANT: Church was always an important thing. We walked from our home. We could walk from our home to

church to my school to my parents' workplace. I grew up in that way. The big things on the weekend were Lawrence Welk and Walt Disney and Bonanza.

And before church on Saturday night, we prepared for it. My mom would always polished the shoes until we were old enough and get the clothes out. And we -- I wouldn't tell you I never missed, but we made quite a habit of it. I began my music career in the church when I was quite young.

I lived during the time of civil rights explosion. I lived through non-segregation, segregation. I was not far from Mr. Lewis when he was knocked down near the Edmund Pettus Bridge. I saw that as a small boy. I remember exactly where I was standing when I was told that John Kennedy was killed.

I've seen things that most people have not. I remember exactly eating corn chips with my friend Ricky Balchon when Neil Armstrong stepped on the moon.

I entered a lot of civic organizations associated with the church. Went into the Boy Scouts, attained my Eagle and my Silver Palm commendation quite young for anyone. I was 14 when I completed it all and collected most all the merit badges. I sang in most churches around and entered competitions and music competitions.

I worked for several places. I worked baling hay. I worked a local mop factory painting mop handles. I was spotted working, and I was offered positions. Social Security

Administration where I worked through my early school and into college.

My academics were quite well. I was offered scholarships every college I applied to. I was accepted to every college I applied to. I was accepted to Johns Hopkins, to Duke. I chose Indiana because it was the foremost music school on the planet.

I went to Indiana under scholarship; otherwise, I would not have been able to go. My mother never earned more than 20-, $22,000 a year. From that I worked hard and saved. I paid for my college.

You have the record there in front of you. I continued my master's study working on things. After college I realized it would not be a terribly lucrative career. I started looking at other options. I began to teach myself to be an engineer. From a bachelor of music degree, I started -- just as I have continued my entire life up to present, I worked on that.

I became a simple phone answerer by questionnaire tests with AT&T. When Lucent split, I was sent with them to Denver. During that time, as still happens now, companies were swallowed up left and right. I found my self working for a lot of different companies. I went through Time Warner. I went through H&R Block. I went through Hershey's. All through mergers and acquisitions.

I had achieved the title of senior engineer when 9-1-1 happened. I personally rebuilt the trunks in city hall in New York City after 9-1-1. They had a switch, a contract in the building next door. The towers were destroyed. They were -- city hall was serviced off that. I sat for three days at my desk working, establishing communications there, which I received quite a large award from Time Warner for that.

It was around that time that I met my would-be wife. She had no idea of the things that I did or what I did in work.

I continued that. I continued to get passed around by company, offered other positions, moving up. I was offered the position to be moved to Basin, Wyoming, is how I came to Wyoming in 2005.

I would like to say on behalf of the charge of the game and fish, I discovered -- and this is a learning experience for, I bet, everyone in this room -- Wyoming counts the residency from the expiration of the license not the time that you hunt. So I was caught in that because in Colorado the license doesn't expire until the last day of March.

So Wyoming began the count at the end of March. I counted from the time that I hunted, which was September. And so I had -- I went to the game and fish and asked them -- talked about that. It just was one of those technicalities where you get caught up in it. I was living in Basin at the

time. I was accused of being a non-resident. I had a Wyoming driver's license. I was drawing my check from TCT in Basin.

It was a thing that should never happened. And the person that investigated me lost her job, appealed that to the supreme court and lost because she had been aggressive in her things. But that was never removed from my record. The local prosecutor there in Basin did everything he could to get the charge dropped, but they don't typically drop those kind of things. So beyond that I've had four traffic tickets in my life.

I continued to work. I put my -- before she was -- my wife through college. I paid for that. She became that. Part of the divorce thing and one of the reasons that the truth is very difficult thing to find is I actually had to assist her in attaining her degree, and that was what the protection order is based on. When that fact came out, it said that I was harassing her, which is not true.

The prosecutor here has been provided with a lot of statements. What they've not been provided with is, if I have been at this person's house all of these times, all these dozens and dozens of times, why have I not been charged by them. Why -- why did I not -- that would be a felony. Yet, they've elected not to bring any charges to me. When they did, they realized there was nothing there and they subsequently dropped them.

So I continued to work. I went on. We were in Cody, in Wyoming, because of my work. I was then moved to Billings where I worked. I went through Charter, Bresnan, all of the companies that were acquired and traded and -- and did that sort of thing.

I built most of the 9-1-1 systems in Northern Wyoming, the trunking back and forth. I hold an honorary sheriff's badge for Big Horn County. This coming after the conviction from the game thing. So, if Sheriff Blackburn had thought I had done something wrong, he certainly wouldn't have done that. I've saved them countless dollars going down on Sunday working on their systems during my career.

Toward the end of my a career, I no longer had to seek jobs. Companies came to me. I had -- at the house that was searched, I had representatives of TCT come back and ask me to go to work for them after Bresnan. I had Metaswitch come back and ask me to work for them. Which I did work for them for quite a time.

Metaswitch was acquired by Microsoft. I was asked to remain for Microsoft, and I worked for them attaining their highest level of engineer. All of this from a Bachelor of Music.

I would respectfully say I've not harassed my ex-wife in any way. No time have I been anywhere near her that did not involve my children.

I think that the U.S. prosecutor is wrong. I am a victim because I was sent to Billings supposedly on a shopping trip. I came back. My home was empty. It's a common story for men in America. I would like for the Court to consider what it's like to try to rebuild your life not knowing where your children are, not knowing their phone number, not knowing where -- what's going on. One would tend to go looking for them, and I did. In no way has she ever been threatened or have I threatened anyone or, as -- as Mr. Krone has said, no way firearms being any part of that.

In fact, I grew up between two of greatest gunsmiths of the 19th and 20th Century. Jerry Eggleston was quite a noted stockmaker. Spent a lot of Saturdays with him at his home working on these things. Kenny Jarrett is the other one in Jackson, South Carolina. He's world famous. He is -- he is the father and the reason that all these rifle companies exist, and I spent a lot of time with him.

The history with the firearms and the collection is extensive and long ranging, and it had nothing to do with this. And originally in the protection order, I would like to say, Judge Darrah correctly noticed the Lautenberg Amendment and he didn't have any issue with that. And then suddenly he changed.

My understanding is that they're supposed to assist you with disposing of the firearms. And if you look at the

numbers that he had and the numbers that are reported on this, you will see that they were significantly reduced. As I talked through the paralegal to the representative for the United States, they didn't -- they did not demand forfeiture. They were willing to work with me because each of those firearms has a supporting purpose. Each of those firearms were slated to go to my children. That's why you'll see three of the same thing here and three of the same thing there.

They're -- I keep an extensive firearm journal from the early '90s. And if you would look at it or if you choose to look at it, you would notice that -- all of the -- the things that are in there. As a collector, I'm quite different than the average collector. I have chronographs. I have examination tools that even the finest gunsmiths in the country do not have.

This is not any kind of a threat, Your Honor, to anyone. This is just a hobby. And part of my willingness to be in Wyoming was one of the places that I considered to be safe in firearm ownership was Wyoming. There's a reason that John Olin sent his collection to the Cody Firearms Museum. And there's a reason that I'm in Cody, and it has a great deal to do with the ownership of those. And they're not in any way terroristic or -- or threatening to anyone.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Bailey.

Well, a couple of things. First, in terms of the 3553 factors which are what drives this Court's decision, I have to look at the nature and circumstances of the offense and the history and characteristics of Mr. Bailey.

Circumstances of this offense are the knowing possession of firearms and destructive devices after being advised that he was not entitled to do so. Mr. Bailey continued to possess those. And based upon history and discussions that I've heard, I think Mr. Bailey loved his guns more than he loved the law in terms of the limitations. And that is unfortunate.

But aside from -- from that, the reality is is we have two pipe bombs, a silencer, and a machine gun. Regardless of who was the greatest gunsmith there was, those are not allowed to be possessed absent licensure and a stamp registration. Those -- that was not done. And aside from any collectors item or any hunting purpose, that is a violation of federal law.

On the other side, in terms of evaluating factors that weigh towards a higher or lower sentence in this matter, this appears -- the conduct of Mr. Bailey appears aberrant given his prior history and background. Mr. Bailey, until his wife and he -- or his ex-wife and he divorced, had a de minimis background of any violation of law. Certainly there's the situation regarding the game and fish, and I'm not

-- it's not counted as criminal history, so it doesn't really matter. But what does matter is is that he knew what the law was and told what -- what he needed to do, and -- and he ignored that.

This is also a circumstance where the Court certainly sees there's a reason why Congress has decided to preclude those individuals under domestic protective orders from possessing firearms. We saw the other day in the news we have an individual that is a neurosurgeon or something that decided to travel back to Columbus, Ohio. And he's alleged to have killed his ex-wife seven years later. Animosity, the -- the personality, and the emotion that is tied to children, to marriages, to wives, husbands, significant others is and can provide a catalyst to the poor choice that results in harm to that individual, putting law enforcement in harm's way in trying to address those issues.

But the bottom line is is that this case and the reasons for the restriction upon Mr. Bailey from possessing is not without reason or purpose. The Court has some concern as to deterrence of criminal conduct. Mr. Bailey's certainly got reasons for everything, including reasons as to his not having been the one that was wronged here -- or the one that was in the wrong. Reality is is he knowingly possessed firearms that he was not allowed to possess whether -- even some of them whether a domestic violence order was out there or not.

There is the need for -- in this case considering the 3553 factors weighs towards the higher end of a sentence in terms of the need to promote respect for the law and get Mr. Bailey's attention. That being said, again, his background is such that it would suggest that he is being driven by less than his typical thought.

I mean, Mr. Bailey, you are an extremely intelligent man. You also are extremely capable, and I think you're also loved and respected by those friends that you -- obviously have submitted letters on your behalf. But there is a component of vindictiveness or anger that you have that is making -- or that resulted in you making a poor choice in this case.

Protecting the public from further crimes being committed by Bailey -- Mr. Bailey, I certainly think that in considering that, given his background, I think they cancel it out, his lack of prior criminal history. But then his poor choice in this despite knowing that he was not allowed to engage in that conduct is -- I think equals each other out.

The need to protect the public from further crimes being committed by Mr. Bailey, I certainly believe that a certain amount of sentence is necessary. But whether or not it will be sufficient to remove his angst and anger and vitriol towards his significant -- or former significant other, I don't know. I mean, we have laws in place though for

the reasons of protecting the public, for avoiding situations that can lead to toxic and deadly circumstances.

The last factor this court looks at in terms of providing defendant with needed educational or vocational training or medical care is really somewhat of a nonfactor in this case in the sense that Mr. Bailey has got his degree in music, and he's certainly employable and has demonstrated his vocational and educational abilities. Fortunately, his health is pretty good. I think that weighs towards a lower end if we're going to look at the factors under 3553.

The other component this Court must look at is is the need to provide a sentence consistent with other defendants -- similarly situated defendants. In the end there's a couple of things that I looked at in terms of the calculation that I see that I think support a variance to the sentence. One is is the total number of firearms.

According to the calculations we were at total of 28. Threshold is 25 to get to the six-level add on. I think that that -- given the range of 25 to 99, he could have had 98 and still faced only six levels. I think that a reduction from the 6 to a 5 is appropriate. So one-level reduction of the specific offense characteristics in the form of a variance considering that range, the Court finds that that would be appropriate.

The Court also finds that given his background and

the aberrant behavior that he engaged in here also supports a one-level variance.

So in total I would make a two-level variance under the advisory guideline calculation downward, and that would provide us with a total offense level of 24 with a Criminal History Category I. And I would find a sentence of 51 months is sufficient, but not greater than necessary considering those 3553(a) factors.

And pursuant to the Sentencing Reform Act of 1984 and those factors enumerated under 3553(a), it is the judgment and sentence of this Court that the defendant, Randall Thomas Bailey, is hereby sentenced to a term of 51 months per count to be served concurrently in the custody of the Bureau of Prisons. That sentence should run concurrent to the sentence in Park County -- is that Circuit Court -- Matter CR-2024-221-COD.

The Court would further find, after an individualized assessment as to the length of supervised release and consideration of those factors under 3553(a)(1) and (a)(2)(B) through (D) and (a)(4) through (7), the conviction -- the offense of conviction is serious in nature, involving unlawful possession of over two dozen firearms, some of which were unlawful for the defendant to possess prior to the issuance of the protective order, two pipe bombs and one silencer as well as machine gun. The way in the which defendant used the

firearms considering he possessed the destructive devices and the potential to facilitate felony offenses; namely; violating a protection order and stalking, the Court would find that a term of three years of supervised release per count is appropriate and to be served concurrently.

The record demonstrates that ongoing monitoring and treatment are essential to reduce the risk of recidivism, and the Court further finds that supervision will assist in addressing Mr. Bailey's rehabilitative needs. And specifically the conditions will provide opportunities for mental health and cognitive behavioral treatment interventions as well as protecting the public.

Within 72 hours of his release from the custody of Bureau of Prisons, Mr. Bailey shall report in person to the probation office in the district to which he is released. While on supervised release, he shall comply with the mandatory and standard conditions adopted by this Court and as set forth in the general orders adopting and setting forth the District of Wyoming's mandatory and standard conditions of supervised release and probation filed July 20, 2023, and referenced in the presentence report.

In accordance with those factors under 3553(a), additional special conditions as detailed in paragraph 65 of the presentence report are added to address the nature and circumstances of the instant offense. Mr. Bailey has a

documented history of mental health problems and criminal history. And his reported childhood trauma and recent trauma related to his divorce indicate that he may benefit from mental health treatment interventions, and he's ordered to undergo a mental health assessment to the evaluate those.

Given his prior history, a condition requiring him to participate in cognitive behavioral therapy will provide insight to effective problem solving strategies that will help him to be successful on supervision and within the community.

Given his criminal history includes multiple instances of stalking and violating protective orders against previous domestic partners, a condition is ordered requiring he disclose to -- his history of domestic violence to further -- to any future domestic or romantic partners. And a probation officer may verify such notification has been made.

In light of the circumstances and relevant conduct and the harm inflicted on the victim, a condition requiring that he have no contact with Sara Bailey is ordered. I -- I don't see -- obviously, there can be a modification sought if things change. But at this point in time given the nature and history and characteristics and the events right, wrong, or indifferent, the Court believes that Mr. Bailey and Sara Bailey would best be served -- and the public as well as law enforcement are best served by a no contact order. And certainly the Court would consider a modification if things

change. But at this point in time I believe that that is the safest and most appropriate situation.

A search condition will be ordered to promote public safety through effective oversight and to enforce the other conditions of supervision.

In accordance with 3583(d), the Court finds these conditions are reasonably related to the deterrence of criminal conduct, protection of the public from further crimes being committed by Mr. Bailey and address Mr. Bailey's vocational, medical, or other correctional needs and involve no greater deprivation of liberty than is reasonably necessary for the purposes of deterring criminal activity, protecting the public, and promoting his rehabilitation and are consistent with pertinent policy statements issued by the sentencing commission.

The Court finds that restitution is not authorized in this case.

Court finds that Mr. Bailey has the ability to pay a fine and would impose a fine in the amount of $1,000 due immediately inclusive of penalties and interest if applicable.

It is further ordered that he shall pay a special assessment fee in the amount of $200 which will be due immediately and payable to the Clerk of the U.S. District Court for the District of Wyoming.

Mr. Bailey shall participate in the inmate financial

responsibility program to pay his monetary obligations which are due immediately and while incarcerated make payments of at least $25 per quarter. Any amount not paid immediately or through that inmate financial responsibility program shall be paid commencing 60 days following his release from confinement in monthly payments of not less than 10 percent of his gross monthly income. All monetary payments shall be satisfied not less than 60 days prior to the expiration of any term of supervised release.

As to Counts One and Three, any objection to the United States' oral motion on dismissal?

MR. KRONE: No objection, Your Honor.

THE COURT: All right. I would dismiss, in accordance with the terms of the plea agreement, Counts One and Three of the indictment.

As to the forfeiture, I would direct the forfeiture of the property identified in the plea agreement to the extent Mr. Bailey retains any interest in it. To the extent that those items have been dispersed -- and I think that was a discussion when the change of plea was made -- and he no longer possesses them, then that is fine. But what I don't want is is Mr. Bailey to run afoul of the law in the event -- once he gets out, given the conviction.

You -- Mr. Bailey, absent a restoration of your rights, you do not have the right to possess firearms. And,

obviously, I don't want anybody being transferred a machine gun or destructive device or silencer. So those things would obviously be subject to forfeiture.

With that is there any request as to location or facility? I note that Mr. Bailey has a significant other that resides in Aspen, Wyoming.

AUDIENCE MEMBER: Your Honor, if I may --

THE COURT: Ma'am, I don't -- I don't know who you are, and you're not -- you're not a member of the bar.

So, Mr. Krone --

MR. KRONE: Your Honor, yes, that's Ms. Mudder, Mr. Bailey's significant other. She resides in Alpine, Wyoming. And I don't -- I don't know if there was a specific request that she wanted to make in terms of a location, Your Honor.

But I would request -- Your Honor, I believe that Mr. Bailey would be a good candidate for the First Step Act and would request a recommendation in that regard.

THE COURT: All right. Well, I would -- to the extent that he would qualify, I'd recommend him for placement in Englewood, Colorado, potentially or Yankton, South Dakota.

MR. KRONE: Okay. Thank you, Your Honor.

THE COURT: All right. With respect to any other matters -- I'm going to advise Mr. Bailey of his right to appeal. But are there any other matters that we need to

address or an objection to the sentence as pronounced?

Ms. Hammer.

MS. HAMMER: No, Your Honor. Thank you.

THE COURT: Mr. Krone.

MR. KRONE: No, Your Honor. Thank you.

THE COURT: All right. I would then advise you, Mr. Bailey, you have the right to appeal the judgment and sentence being imposed upon you today. In order to perfect that right, you must exercise it within 14 days from the date of which judgment and sentence is imposed by filing a notice of appeal with the Clerk of District Court for the District of Wyoming. If you fail to file that notice of appeal within that 14-day period of time, you could forever be barred from challenging the judgment and sentence being imposed upon you today.

Do you understand these rights?

THE DEFENDANT: I do.

Can I ask him a question?

THE COURT: Go ahead. You may.

(Defendant and counsel confer.)

MR. KRONE: I don't think we have anything further, Your Honor.

Thank you.

THE COURT: Anything further, Mr. Bailey?

THE DEFENDANT: No, sir.

THE COURT: All right. In terms of the sentencing, I would impose the sentence as stated and remand for custody for service of the sentence as imposed.

Mr. Bailey, I wish you the best of luck. I certainly think you have incredible value and abilities. But, obviously, the law is the law, and it applies to us all.

I'll remand.

We'll stand in recess.

THE DEFENDANT: Thank you.

THE COURTROOM DEPUTY: All rise.

Court stands in recess subject to call.

(Proceedings concluded at 5:46 p.m., January 14, 2026.)

C E R T I F I C A T E

I, Shannon L. Zelt, Federal Official Court Reporter for the United States District Court, District of Wyoming, and Registered Professional Reporter, do hereby certify that I reported by realtime stenography the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 4th day of February, 2025.

Shannon L. Zelt, RPR

**Shannon L. Zelt, RPR**
**Federal Official Court Reporter**